**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHEAST GAS GENERATION, LLC, | ) | Case No. 20-11597 (MFW) |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Rel. Docs. 423, 438 |
| _____ | ) | |

**MEMORANDUM OPINION**[1]

Before the Court is the motion of NorthEast Gas Generation, LLC ("NEG") to reopen the case and to reconsider the amount of the allowed First Lien Claims, bifurcate those claims into secured and deficiency claims, and adjust the amount of the Reinstated First Lien Debt as defined in the Debtors' confirmed and consummated plan of reorganization (the "Motion"). Because the Court concludes that it cannot grant the relief requested, the Court will deny the Motion.

I.   BACKGROUND

On June 18, 2020, NEG and its affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. On December 18, 2020, the Court confirmed the Debtors' Second Amended Joint Chapter 11 Plan (the "Plan"). (D.I. 354.) On December 22, 2020, the Plan became effective and was substantially consummated. (D.I. 354 ¶ 54 & 360.) The

---

[1]   This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable hereto by Rule 9014(c).

bankruptcy cases were closed on April 20, 2021.  (D.I. 412.)

Under the Plan, the First Lien Secured Parties[2] received their pro rata share of 100% of (i) the equity in the reorganized lead debtor, NEG, and (ii) the Reinstated First Lien Debt, defined in the Plan as a total of $200 million.  (D.I. 354 Ex. A, at Arts. I.A.110, III.B.3, & V.C.)  The First Lien Secured Parties were impaired and their class voted to accept the Plan. (Id. at Art. III.A; D.I. 326.)[3]

On October 7, 2021, NEG[4] filed the Motion seeking (i) to reopen the bankruptcy case, (ii) to reconsider the allowed amount of the First Lien Claims, (iii) to bifurcate those claims into secured claims of $475 million and deficiency claims for the balance, and (iv) to increase the amount of Reinstated First Lien

---

[2]    First Lien Secured Parties, First Lien Claims, and Reinstated First Lien Debt are used herein as defined in the Plan. (D.I. 354 Ex. A.)

[3]    Under the Plan, Priority Non-Tax Claims, Other Secured Claims, and Intercompany Interests were unimpaired.  (D.I. 354 Ex. A, at Art. III.A.)   Equity Interests in NEG and Intercompany Claims received no distribution.  (Id.)  First Lien Claims, Second Lien Claims, and General Unsecured Claims were treated as impaired and entitled to vote.  (Id.)   Second Lien Claims received nothing; General Unsecured Claims received their pro rata share of a $2 million fund (Id. at Art. III.B.)  All three impaired classes voted to accept the Plan.  (D.I. 326.)  In its Motion, NEG contends that most general unsecured creditors were paid during the case and that only a limited number remained unpaid as of confirmation and were paid in full under the Plan. (D.I. 423, at n.5.)

[4]    As stated above, NEG is now owned entirely by the former First Lien Secured Parties, who also hold the Reinstated First Lien Debt in NEG.

Debt issued under the Plan to the amount of the secured claims.
Thus, the Motion in essence asks the Court to increase the amount
of the Reinstated First Lien Debt from $200 million to $475
million.  NEG argues that "the only impact of the relief . . .
would be to reallocate how the proceeds from a disposition of the
assets are allocated as between the bank's reinstated secured
debt and its 100 percent equity stake."  (D.I. 437 at *6.)

NEG served the Motion on the top twenty unsecured creditors
as well as secured creditors and government agencies.  (D.I. 429 &
430.)  No objection was filed.  A hearing was held on November 3,
2021, at which time the Court raised concerns about its ability to
grant the relief requested and asked for additional briefing.  NEG
filed a supplemental brief in support of its Motion on November
17, 2021.  (D.I. 438.)  The matter is ripe for decision.


II.  <u>JURISDICTION</u>

The Court raised concerns at the hearing about the extent of
its jurisdiction post-confirmation in light of the Third
Circuit's holding that post-confirmation "retention of bankruptcy
jurisdiction may be problematic."  <u>Binder v. Price Waterhouse &</u>
<u>Co., LLP (In re Resorts Int'l, Inc.)</u>, 372 F.3d 154, 164-65 (3d
Cir. 2004).  Specifically, the Third Circuit held that for the
bankruptcy court to retain jurisdiction after confirmation over
disputes "related to" a bankruptcy case there must be a "close

nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." Id. at 166-67. Thus, the fact that the Court retained jurisdiction under the Confirmation Order and the order closing the case may not be dispositive. (D.I. 354 ¶ 45 & Ex. A, at Art. XIII.J; D.I. 412 ¶ 10.)

As framed by NEG, however, this matter is "core" because it involves the allowance of claims and the interpretation of the Plan. (D.I. 423 ¶ 7.) 28 U.S.C. §§ 157(b) & 1334. Therefore, it argues that Resorts is not a bar to the exercise of jurisdiction by the Court. The Court agrees and concludes that it has jurisdiction to consider NEG's Motion.

Furthermore, NEG consents to this Court's power to enter a final order on this matter, even if the Constitution would otherwise preclude it from doing so. (D.I. 423 ¶ 7.) Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 679 (2015).

III. DISCUSSION

A.  Reconsideration of Claim Under § 502(j)

NEG argues that by its Motion, it is only asking the Court to reconsider the allowed amount of the First Lien Claims under section 502(j) of the Bankruptcy Code, by determining that $475 million of that claim is secured based on the correct value of the collateral as of the time of confirmation. After doing so,

4

NEG asks the Court to conform the Plan to the allowed amount of the Claims, pursuant to section 105, by modifying the definition of Reinstated First Lien Debt that the First Lien Secured Parties receive under the Plan from $200 million to $475 million.  NEG argues that by simply reconsidering the allowance of the First Lien Claims the Court is not bound by the requirements of section 1127 for modification of a plan.  See United States Dep't of the Treasury - Internal Revenue Serv. v. EB Holdings II, Inc., No. 2:20-cv-01311-GMN, 2021 WL 535467, at *4 (D. Nev. Feb. 11, 2021) (affirming bankruptcy court's conclusion that adjusting a claim under § 502(j) is distinct from modifying a plan under § 1127); In re Disney, 386 B.R. 292, 303 (Bankr. D. Colo. 2008) (allowing post-confirmation reclassification of claim and corresponding modification of treatment of that claim under chapter 13 plan); In re Davis, 404 B.R. 183, 188 (Bankr. S.D. Tex. 2009) (same); In re Van Dyke, 286 B.R. 858, 861 (Bankr. C.D. Ill. 2001) (granting reconsideration of order disallowing claim – after consummation of a chapter 11 plan - because creditor never received notice of objection to its claim).

The Court finds the cases cited by NEG to be distinguishable.  The Disney and Davis cases both concerned the post-confirmation reclassification of claims and corresponding modification of chapter 13 plans, not chapter 11 plans.  Those cases relied on section 1329 which, unlike section 1127, allows

modification of a confirmed plan "before the completion of payments under such plan" rather than before substantial consummation.

While Van Dyke was a chapter 11 case, the issue which the court decided was that it could reconsider the disallowance of a secured creditor's claim under section 502(j) despite years of delay because the creditor had not received notice of the objection to its claim.  Id. at 860-62.  There was no request in Van Dyke to modify the treatment of that claim under the confirmed plan, which provided that it was to be paid in full from the liquidation of its collateral.  286 B.R. at 859-60.

Similarly, in EB Holdings, the court found that reconsideration of the claims did not constitute a modification of the plan because the treatment of the claims would not change: they would still receive 86.11% of the reorganized debtor's stock even though the allowed amount of their claims would increase. 2021 WL 535467, at *4.[5]  Unlike the creditors in EB Holdings, the First Lien Secured Parties in this case do not simply seek to change the amount of debt that they are exchanging for equity; they seek to increase the amount of their distribution under the Plan by increasing the amount of Reinstated First Lien Debt they receive.

---

[5]    While the proposed change in EB Holdings did not change the treatment that the creditors received under the plan, it did provide the debtor with a potential tax benefit which caused the IRS to object.  2021 WL 535467, at *4.

Further, NEG is not really asking for reconsideration of the allowance of the First Lien Claims.  Those claims were deemed allowed pursuant to the Plan in the total amount of approximately $539 million.  (D.I. 354 Ex. A, at Art. III.B.3.)  Rather, as noted, NEG is seeking to modify the Plan by changing the treatment of those claims under the Plan to give them 100% of the equity of NEG plus 100% of Reinstated First Lien Debt which it asks the Court to increase from $200 million to $475 million.  (Id. at Art. I.A.110.)  Thus, the Court concludes that NEG does not seek relief under section 502(j) alone; it also seeks to modify the Plan to change the treatment of the First Lien Claims.

Simply calling its Motion one to reconsider a claim does not change that fact.  Cf. In re Rickel & Assocs., 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001) ("It is true that the debtor has not technically proposed to disturb the Plan or modify it.  Instead, it has moved to modify the Confirmation Order.  The distinction, however, is irrelevant, and the result is the same.  A debtor cannot circumvent § 1127(b) and change the plan simply by calling its request a motion to modify the confirmation order.").  Therefore, the Court must determine whether the proposed change is permissible under section 1127.

B.    Modification of Plan Under § 1127

Section 1127(a) provides that the proponent of a plan may modify a proposed plan at any time before confirmation; section

7

1127(b) provides that, under certain circumstances, the proponent
of a plan may modify a plan "after confirmation of such plan and
before substantial consummation of such plan."  11 U.S.C. § 1127.
There is no provision allowing modification of a plan after
substantial consummation.

NEG concedes that substantial consummation has occurred in
this case.  NEG does not dispute that the caselaw construes
section 1127(b) to prohibit modification of a confirmed plan
after it has been substantially consummated.  See In re UNR
Indus., Inc., 20 F.2d 766, 769 (7th Cir. 1994) ("Another section
of the Code, 11 U.S.C. § 1127(b), dramatically curtails the power
of a bankruptcy court to modify a plan of reorganization after
its confirmation and 'substantial consummation.'"); Rickel, 260
B.R. at 677 (holding that "the literal terms of § 1127(b) bar any
effort to modify the Plan" after it has been consummated).
Instead, NEG contends that the proposed change is not a
modification of the Plan.

### 1.   Applicability of the Bankruptcy Act

In support of its argument, NEG asserts that, because
modification is not defined in the Code, the Bankruptcy Act is
instructive.  See Cohen v. de la Cruz, 523 U.S. 213, 221 (1998)
(holding that pre-Code law is not displaced unless there is a
clear indication that Congress intended to do so).  In
particular, NEG asserts that the Court should consider section

229 of the Bankruptcy Act, which had allowed "alteration or modification" of a plan after substantial consummation as long as it did not "materially and adversely [affect] the participation provided for any class of creditors or stockholders by the plan." 11 U.S.C. § 629 (repealed 1978).  NEG argues that the proposed modification of the Plan in this case benefits the First Lien Secured Creditors and does not change the treatment of any other class of creditors or shareholders, and, therefore, it should be permitted.

The Court finds NEG's reliance on section 229 of the Bankruptcy Act inappropriate.  In enacting section 1127(b) of the Code, Congress deleted the very provisions in section 229 of the Act on which NEG relies: allowing modification of a plan after substantial consummation if it does not "materially and adversely" affect any other creditor or shareholder.  <u>Compare</u> 11 U.S.C. § 1127(b) (2018) <u>with</u> 11 U.S.C. § 629 (repealed 1978). This is not the "stylistic" change that the Court in <u>de la Cruz</u> found was insufficient evidence of an intent to change pre-amendment practice.  523 U.S. at 221 (holding that caselaw under the Act prohibiting discharge of any "judgment" for fraud survived under Code language prohibiting discharge of any "debt" for fraud, where Congress described the change as "stylistic"). Instead, the Court concludes that the deletion in section 1127(b) was a clear indication of Congress's intent to change pre-Code

law and not permit modification of a plan after it has been substantially consummated, even if the change would have no materially adverse effect on any party.  Where a provision of the Code deals with the same subject matter as a provision of the Act but unambiguously mandates a different result, it is the language of the Code, not the repealed Bankruptcy Act, that governs. "[W]hile pre-Code practice 'informs our understanding of the language of the Code,' it cannot overcome that language." Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 10-11 (2000) (concluding that "Pre-Code practice cannot transform § 506(c)'s reference to 'the trustee' to 'the trustee and other parties in interest.'") (internal citations omitted); In re Federal-Mogul Global Inc., 684 F.3d 355, 377 (3d Cir. 2012) (holding that pre-Code practice "deserves little weight" where the "plain and unambiguous language" of the Code mandates a contrary result).

NEG argues, however, that caselaw under the Code perpetuates the standards of section 229 of the Act by focusing on whether the proposed modification of a plan would materially and adversely affect other creditors in determining whether it is impermissible under section 1127(b).[6]  NEG argues that the

---

[6]    See In re SCH Corp., 597 Fed. Appx. 143, 148 (3d Cir. 2015) (holding change was impermissible because it materially and adversely altered substantive rights under the plan by extending the life of the plan for three years); In re U.S. Brass Corp., 301 F.3d 296, 308 (5th Cir. 2002) (holding that "settlement" requiring arbitration rather than litigation was impermissible

proposed change to the Plan is not material but rather <u>de minimis</u> – it would only require a change to one definition – and is not adverse to any party because it does not affect the distribution to any other creditor.

The Court is not convinced by NEG's interpretation of the caselaw.  Only one of the cases it cites actually stated that "[s]ection 1127 requires that the court not adopt a modification that materially alters the plan and adversely affects creditors' treatment."  <u>In re El Comandante Mgmt. Co. LLC</u>, No. 07-1501, 2008 WL 11504100, at *4 (D.P.R. Mar. 31, 2008).  The Court finds the <u>El Comandante</u> decision unpersuasive, however, because it indirectly relies on pre-Code law for its statement of that principle of law.[7]  The Court finds caselaw under the Act is not

---

under § 1127(b) because it would materially alter the bargain the insurers secured in exchange for their approval of the plan); <u>Joint E. & S. Dist. Asbestos Litig. (In re Johns-Manville Corp.)</u>, 982 F.2d 721, 748 (2d Cir. 1992) (concluding that a settlement materially altering creditor's right to payment under the plan was impermissible modification under § 1127(b)); <u>In re El Comandante Mgmt. Co. LLC</u>, No. 07-1501, 2008 WL 11504100, at *4 (D.P.R. Mar. 31, 2008) (reversing order allowing payment of attorneys' fees from funds reserved under plan for creditors because it materially and adversely altered creditors' rights); <u>In re Vencor, Inc.</u>, 284 B.R. 79, 85 (Bankr. D. Del. 2002) (refusing to remove an injunction in a consummated plan because it was "material and would require that the entire Plan be revisited").

[7]    The <u>El Comandante</u> decision cites the <u>Best Products</u> case to support its statement of the requirements of § 1127(b).  <u>In re Best Products Co., Inc.</u>, 177 B.R. 791, 802 (S.D.N.Y. 1995).  <u>Best Products</u>, however, relies on a case under the Act, as authority for that principle.  <u>Id.</u> (citing <u>In re Hudson & Manhattan R.R. Co.</u>, 332 F. Supp. 718, 721 (S.D.N.Y. 1971)).

germane because, as noted above, section 1127(b) of the Code differs significantly from section 229 of the Act.

Furthermore, neither <u>El Comandante</u> nor any of the other cases cited by NEG actually held that section 1127(b) <u>permits</u> modifications which are <u>not materially adverse</u>.[8]  Though that argument was made in the <u>Joint E. & S. Dist. Asbestos Litig.</u> case, the Second Circuit found it unnecessary to address it, stating that "[e]ven if the concept of 'modification' implies some distinction between significant changes of substance, which are prohibited, and minor changes of procedure, which might be allowed, the alterations accomplished by the Settlement are both substantive and significant."  982 F.2d at 747.

In addition, many of the Code cases dealing with this issue do not base their holdings on a finding that the change was material and adverse but on the fact that section 1127(b) is an absolute bar to modification after substantial consummation. <u>See, e.g.</u>, <u>In re WBY, Inc.</u>, No. 16-52291-JRS, 2019 WL 3713686, at *10-11 (Bankr. N.D. Ga. Aug. 5, 2019) ("Regardless of the nature of the requested change, a plan cannot be modified once it has been substantially consummated."); <u>Rickel</u>, 260 B.R. at 677 ("Here, the parties agree that the plan has been substantially consummated.  Hence, the literal terms of § 1127(b) bar any

---

[8]    <u>See</u> <u>SCH Corp.</u>, 597 Fed. Appx. at 148; <u>U.S. Brass</u>, 301 F.3d at 308; <u>Joint E. & S. Dist. Asbestos Litig.</u>, 982 F.2d at 748; <u>El Comandante</u>, 2008 WL 11504100, at *4; <u>Vencor</u>, 284 B.R. at 85; <u>Rickel</u>, 260 B.R. at 677.

effort to modify the Plan."). Therefore, while NEG is correct that the technical changes to the Plan would be small – modifying only one definition – the Court concludes that section 1127(b) does not permit such changes to a confirmed and consummated plan of reorganization.

The few cited cases that did allow changes to a plan did so not because they were immaterial or not adverse but rather because they were expressly contemplated by the plan or were clarifications of an ambiguous plan.[9]

### 2.   Clarification Rather Than Modification

NEG does not argue that the proposed change is expressly envisioned by the Plan.[10]   The Court agrees that the Plan does not provide for the change.   Articles I and III do not have any provisions allowing modification of the definition of Reinstated

---

[9]    In re Johns-Manville Corp., 920 F.2d 121, 128 (2d Cir. 1990) (allowing change to distribution process because plan contemplated and permitted such changes to be made by the trust); Beal Bank, S.S.B. v. Jack's Marine, Inc., 201 B.R. 376 (E.D. Pa. 1996) (concluding that bankruptcy court's order requiring satisfaction of mortgage after payment of creditor's claim in full was a permissible clarification rather than a modification of the debtor's plan); In re SS Body Armor I, Inc., No. 10-11255(CSS), 2021 WL 2315177, at *6-7 (Bankr. D. Del. June 7, 2021) (finding change to a plan supplement was permitted by the plan); In re Hampton Corp., Inc., No. 90-05553, 1992 WL 1482466, at *2 (Bankr. D.N.D. July 7, 1992) (finding modification of claim to reflect payments received from guarantor clarified rather than modified plan that was silent on the issue).

[10]    Cf. Johns-Manville, 920 F.2d at 121 (holding change was allowed under the express terms of the plan); SS Body Armor, 2021 WL 2315177, at *6 (holding change was permissible because it was envisioned under the plan).

First Lien Debt or the treatment of Class 3 First Lien Claims.
Furthermore, Article XI, the general provision on modifications,
envisions only modifications which are allowed by the Code.

NEG does argue, however, that the change it proposes would
be a permissible clarification rather than a modification of the
Plan.  It contends that while the First Lien Claims were allowed
in the Plan at $539 million, the Plan failed to bifurcate that
claim into an allowed secured claim and an allowed deficiency
claim.  NEG further argues that though Reinstated First Lien Debt
was defined as $200 million, the parties intended that the
Reinstated First Lien Debt reflect the value of the collateral
securing the allowed First Lien Claims, which they now realize
was really $475 million.  Therefore, NEG asserts that there is a
gap in the Plan, which the Court may fill to reflect the intent
of the parties.[11]

The interpretation of a plan of reorganization is governed
by the same principles as contract interpretation.  See In re
Shenango Grp. Inc., 501 F.3d 338, 344 (3d Cir. 2007) ("In
construing a confirmed plan of reorganization, we apply contract
principles.") (citations omitted).

> [A] bankruptcy court may clarify a plan where it is
> silent or ambiguous.  United States for the Internal
> Revenue Service v. APT Industries, Inc., 128 B.R. 145,

---

[11]   See Beal Bank, 201 B.R. at 376 (change to plan was a
permissible clarification, because plan was silent); Hampton
Corp., 1992 WL 1482466, at *2 (allowing change as clarification
of plan that was silent on the point).

146 (W.D.N.C. 1991).  Bankruptcy courts can also use
this authority to "interpret" plan provisions to
further equitable concerns.  See In re Terex Corp., 984
F.2d 170, 173 (6th Cir. 1993) (holding that bankruptcy
court's award of interest to insurer for unpaid claim
was not modification of confirmed plan but rather
interpretation of plan as equitable action).

Beal Bank, 201 B.R. at 380.

In this case, however, the Court concludes that NEG is not
seeking a minor clarification of the Plan necessary to fill a gap
or further the intent of the parties.  Rather, it is seeking to
change the unambiguous terms of the Plan.  The parties are
sophisticated parties who negotiated and drafted the terms of the
Plan.  The parties did not find it necessary to bifurcate the
First Lien Claims between the secured and unsecured amount, but
instead simply agreed on the treatment that the holders of First
Lien Claims would receive.  The Plan is clear and unambiguous
about the allowance, and treatment, of the First Lien Claims.
They are allowed in full ($539 million) and receive their pro
rata share of the equity in the reorganized debtor and $200
million of Reinstated First Lien Debt.[12]  Where a plan (like a

---

[12]    The Plan provides:
        Each holder of an Allowed Class 3 Claim (or its
        designee(s)) shall receive, in full and final
        satisfaction, settlement, release, and discharge of,
        and in exchange for, each such Claim (except as
        otherwise set forth herein with respect to the
        Reinstated First Lien Debt), (x) its Pro Rata Share,
        relative to the aggregate of all DIP Claims and First
        Lien Claims (or such other allocation as may be
        determined by the First Lien Lenders and the DIP
        Lenders in their sole discretion), of the Distributable
        Equity and (y) its Pro Rata Share, relative to the

15

contract) is unambiguous, its terms must be enforced as written.
WBY, Inc., 2019 WL 3713686, at *12-13 (concluding that
modification was not permitted because there was no ambiguity in
the plan to be clarified); In re Viking Pump, Inc., 52 N.E.3d
1144, 1151 (N.Y. 2016) (holding that under New York law
unambiguous contract terms must be enforced in accordance with
their plain meaning).[13]  The lack of ambiguity of the Plan in
this case distinguishes it from the facts of the cases cited by
NEG which held that a change was expressly permitted by the plan
or did not conflict with any provision of the plan.[14]

---

> aggregate of all First Lien Claims (or such other
> allocation as may be determined by the First Lien
> Lenders in their sole discretion) of 100% of the
> Reinstated First Lien Debt.

(D.I. 354 Ex. A, at Art. III.B.3.)
    Distributable Equity is the equity in the lead debtor, NEG.
(Id. at Art. II.C.)  Reinstated First Lien Debt is defined in the
Plan as "the First Lien Claims in an aggregate principal amount
equal to $200,000,000, which shall be reinstated in accordance
with this Plan and subject to the Reinstated First Lien Debt
Modification Terms." (Id. at Art. I.A.110.)

[13]    New York law governs the Plan. (D.I. 354 Ex. A, at Art.
I.D.)

[14]    In Beal Bank, for example, the District Court concluded that
an order requiring the secured creditor to assign its mortgage
after it was paid in full was not a modification of the plan
under section 1127 because it "did not alter any provision of the
Plan."  201 B.R. at 380.  See also Johns-Manville, 920 F.2d at
128-29 (concluding that plan and trust documents expressly
permitted trust to modify the distribution procedures); SS Body
Armor, 2021 WL 2315177, at *6 (concluding that extension of trust
was authorized by confirmation order and not inconsistent with
the plan); Hampton Corp., 1992 WL 1482466, at *2 (concluding that
determination of amount of creditor's distribution rights under
plan was an interpretation, not modification, of the plan); APT
Indus., 128 B.R. at 147 (holding that filling a gap in a plan was
not a modification of the plan).

Under the express terms of the Plan, if all NEG sought was simply to bifurcate the First Lien Claims and allow the secured portion in the amount of $475 million, those claims would still receive the same treatment: 100% of the equity and Reinstated First Lien Debt in the amount of $200 million.  What NEG is seeking, however, is to modify the Plan by changing the definition of First Lien Reinstated Debt and, consequently, the treatment of the First Lien Claims to give them an additional $275 million in secured debt.

The Court concludes that this is not asking the Court to interpret, clarify, or fill a gap in the Plan.  The proposed modification is contrary to the express terms of the Plan.  Because the Plan has been substantially consummated, section 1127(b) prevents the Court from allowing the change to the Plan proposed by NEG.

C.   Modification of Plan Under § 105

NEG contends nonetheless that its goal can be achieved by application of section 105.  The Court disagrees.  What NEG seeks is to use section 105 to circumvent the requirements of section 1127 which deals with how and when a plan may be modified after it is confirmed.  "Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) (holding that equitable

considerations did not permit exception to absolute priority rule
as codified in § 1129(b)(2)(B)(ii)).  The court in the Rickel
case held that same principle applies to modifications of plans
which are contrary to section 1127(b).

> The proponents of the motion nevertheless contend that
> I can modify the Plan pursuant to the general equitable
> power of the Court under § 105(a) or the provisions of
> Fed.R.Civ.P. 60(b).  Neither contention has merit.  A
> bankruptcy court cannot exercise its equitable powers
> outside of the confines of the Bankruptcy Code, or
> disregard its specific commands. . . .  Consequently,
> it cannot modify a plan under § 105(a), and produce a
> result at odds with the specific provisions of §
> 1127(b).

Rickel, 260 B.R. at 678 (citations omitted).  See also In re
Ionosphere Clubs, Inc., 208 B.R. 812, 816-17 (Bankr. S.D.N.Y.
1997) (general equitable powers under § 105 cannot be used to
achieve a result contrary to § 1127(b)).  Cf. Hampton Corp., 1992
WL 1482466, at *1 (holding that court could rely on § 105 to
modify an allowed claim because it would not contravene § 1127 by
modifying the plan where all creditors were still receiving 35%
of their allowed claims).

NEG argues that at least one court has held that section
502(j) does allow a court to change the treatment of creditors
under a plan if the equities of the case mandate it.  In re
Rankin, 141 B.R. 315, 319 (Bankr. W.D. Tex. 1992).  While the
Rankin court did state that proposition, the Court finds that
statement to be mere dicta.  The Rankin court did not hold that
the plan could be modified but instead relied on the principle of

res judicata to conclude that the creditor belonged in class 2 because the plan did not specify in which class the creditor belonged and counsel for the debtor had represented to the creditor and the court that the creditor was in class 2.  Id. at 320-22.  Thus, the Rankin decision does not support NEG's assertion that a court may modify a plan based on the equities of the case.

NEG further argues that the court in Hampton held that section 105 can be used notwithstanding section 1127 when the proposed change is immaterial.  1992 WL 1482466, at *1.  The Court is unpersuaded.  The materiality discussion by the court in the Hampton case was dicta.  The court in Hampton found that the plan was silent on the issue before the court: whether to modify an allowed claim to account for payments the creditor received from a guarantor.  Id.  Further, the Hampton court made no changes to the plan, material or otherwise.  Id. at *2-3.  In fact, the Hampton court stated that it was "not attempting to circumvent the requirements of section 1127(b)" but instead was clarifying the plan.  Id. at 2.  Therefore, the Court concludes that the Hampton decision does not support NEG's argument.

Even if the Court could modify the Plan under its equitable powers and section 105, the Court concludes that the equities in this case do not favor doing so.

NEG argues that equitable considerations favor granting the Motion because the First Lien Secured Parties advanced debtor-in-

19

possession financing and supported the Plan which allowed the
Debtors to emerge from bankruptcy.  NEG asserts that the First
Lien Secured Parties could have received reinstated liens under
the Plan up to the full amount of their pre-petition secured debt
($539 million).  It also emphasizes that the proposed
modification is not material – changing only one definition in
the Plan – and that no other Plan participant would be adversely
affected.

The Court is not persuaded.  First, the First Lien Secured
Parties are sophisticated parties.  They accepted the terms of
the Plan which gave them 100% of the equity in NEG and Reinstated
First Lien Debt of only $200 million.  Those terms were set,
after negotiations between the Debtors, the other major
creditors, and the First Lien Secured Parties.  (D.I. 306 Ex.
E.)[15]

Second, any plan that provided the First Lien Claims with
additional Reinstated First Lien Debt might not have been
confirmable.  While the First Lien Secured Parties might have
been able to receive their entire claim of $539 million in
Reinstated First Lien Debt, they could not have received any
equity.[16]  Moreover, a plan giving the First Lien Claims $475

---

[15]   Even if they had not expressly negotiated their treatment
under the Plan, the First Lien Secured Parties were impaired by
the Plan and could have voted against, or objected to, the Plan.
They did not.  (D.I. 326.)

[16]   "An unwritten corollary to the absolute priority rule is
that a senior class cannot receive more than full compensation
for its claims."  In re Breitburn Energy Partners LP, 582 B.R.
321, 350 (Bankr. S.D.N.Y. 2018).

million in Reinstated First Lien Debt might not have received the requisite approval of the other impaired creditors or met the feasibility requirements of the Code as required for confirmation.

The proper time to have considered the change to the Plan proposed now by NEG was before confirmation and consummation of that Plan as mandated by section 1127.  If it had been, there would be no possibility, as there is now, of an adverse effect on the rights of the numerous parties who have dealt with NEG in the year since confirmation, in reliance on the terms of the Plan. Therefore, even if the Court had the equitable power to grant the Motion, it would decline to exercise that power.

IV. <u>CONCLUSION</u>

For the reasons stated above, the Court will deny the Motion to reopen this case for the purpose of reconsidering the allowed amount of the First Lien Claims and modifying their treatment under the confirmed and consummated Plan.

An appropriate Order follows.

Dated: March 18, 2022          BY THE COURT:

                                Mary F. Walrath
                                United States Bankruptcy Judge

21